IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

IN THE MATTER OF THE SEARCH OF      )
A SAMSUNG CELLULAR TELEPHONE        )
CURRENTLY LOCATED AT HOMELAND       )    Case No. 2:20-mj-82-1
SECURITY INVESTIGATIONS IN          )
BURLINGTON, VERMONT                 )

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Derik Curtis, being first duly sworn, hereby depose and state as follows:

**Introduction and Agent Background**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device, described with particularity in Attachment A—which is in law enforcement possession and the extraction from that property of electronically stored information described in Attachment B.

2. The property to be searched is a Samsung MS-N970U1 cellular telephone with IMEI: 359198100318707, referred to hereafter as the "Electronic Device." The Electronic Device is currently stored in a faraday container at the Homeland Security Investigations (HSI) office in South Burlington, Vermont—a location within the District of Vermont.

3. I have been employed as a customs officer with Customs and Border Protection since April 2008 and, as such, am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I am presently working full time as a Task Force Officer (TFO) with HSI in the Resident Agent in Charge (RAC) Burlington, Vermont office. I attended and graduated from the Federal Law Enforcement Training Center in Glynco, Georgia. As a TFO with HSI, I have received specialized training related to the investigation of

1

money laundering, financial crimes, and narcotics trafficking. In connection with my duties as a TFO, I have participated in various aspects of investigatory work, including but not limited to, undercover surveillance and undercover narcotics purchases. I have also been involved with investigations where the U.S. Mail, other commercial carriers, and commercial vehicles have been used for the purpose of obtaining controlled substances for the purposes of distributing them in violation of Title 21, U.S.C. §§ 841(a)(1), 843(b) and 846. I have participated in several narcotics-related arrests and the execution of narcotics-related searches, and I frequently have used the services of informants and other confidential sources of information. I have also interviewed several defendants regarding various criminal activities, to include narcotics trafficking. These interviews have included discussions of the use of cellular devices in all phases of the criminal activities and of the use and meaning of code words in the sales and distribution of controlled substances. I have written previous affidavits in support of search and arrest warrants involving evidence from various electronic devices.

4. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth set forth every fact learned by law enforcement during the course of the investigation. Based on the facts set forth in this affidavit, there is probable cause to believe that Matthew MANTONE and others distributed, possessed with the intent to distribute, and/or conspired to distribute controlled substances—including marijuana—in violation of 21 U.S.C. §§ 841 and 846. Further, based on the information set forth herein, probable cause exists to believe that the Electronic Device was used as a communication facility in connection with those offenses or that the Electronic Device otherwise contains evidence of the offenses. The Electronic Device was seized by HSI from MANTONE on June 24, 2020.

5. The facts in this affidavit come from my personal observations, my training and experience, reports and affidavits made available to me by other law enforcement authorities; and discussions with other law enforcement officers.

## Probable Cause

6. On June 24, 2020, at approximately 7:15 pm, officers with the South Burlington Police Department (SBPD) responded to Iris Lane in South Burlington, Vermont for a reported disturbance. During the investigation, officers learned that Matthew MANTONE had approached a residence located on Iris Lane in South Burlington and accused one of the occupants of the residence of owing him money. According to the complaining party, MANTONE then allegedly made threats to the occupants. SBPD officers detained MANTONE at the scene for questioning. MANTONE was in possession of the Electronic Device at the time he was encountered by the SBPD officers.

7. MANTONE advised the SBPD officers that he had come to Iris Lane on foot and that he had come to the residence because the occupant, who exchanges Bitcoin, owed him one hundred dollars based upon a prior transaction. The SBPD officers, with whom I have spoken, described MANTONE's responses to their questions as evasive and not making sense. For example, MANTONE stated to officers that he had walked to the residence where he had been detained. Yet SBPD officers then located MANTONE's vehicle—a 2020 Cadillac bearing Vermont registration HTP-910—parked in the immediate vicinity of the residence. The vehicle was seized by the SBPD after an officer standing outside of the vehicle observed what he recognized as marijuana and a bag with a large amount of U.S. currency within the car. MANTONE was arrested and transported to SBPD.

8. On June 24, 2020, at approximately 11:00 pm, HSI Special Agents and SBPD officers searched MANTONE's vehicle. During the search, investigators located and seized $70,450 in bulk U.S. currency that was contained in an open soft-sided lunch cooler within a straw bag on the back seat of MANTONE's vehicle. The currency, which was piled nearly to the top of the cooler within the bag, was readily visible to HSI Special Agent Zuchman from outside the vehicle. The investigators found that the U.S. currency was banded together with rubber bands. Identification documents for MANTONE—including a social security card, Vermont driver's license, and passport—were also located within the straw bag. Additionally, large duffel bags containing loose dryer sheets were located within the vehicle. Based on my training and experience, I know that loose dryer sheets are frequently used while transporting concealed controlled substances to help obscure their odor. Stems and other marijuana particles were located throughout the vehicle, which is consistent with the prior transportation of bulk amounts of marijuana in the vehicle. Large black garbage bags were found on the back seat of the vehicle as well; the bags were empty, but they appeared to have been used.

9. MANTONE was interviewed by HSI Special Agents Zuchman and Altenburg while he was at the SBPD headquarters. They provided MANTONE with a written copy of his *Miranda* rights, and he signed a form to waive his rights and speak with investigators. The agents warned MANTONE that lying to federal agents was a crime. The interviewing agents have since told me that they felt that MANTONE was continually evasive and deceptive about how he arrived at the residence, about why he was at the residence, and about the origin of the funds found in his backseat. In sum and substance, MANTONE stated that, despite being a local resident, he was residing in hotel room #328 at the Green Mountain Suites located at 401 Dorset

Street in South Burlington. He also stated that he had been driven to the hotel by a friend, but he claimed he could not remember the friend's name.

10. As previously stated, officers seized a Samsung MS-N970U1 cellular telephone IMEI: 359198100318707 (the Electronic Device) was seized from MANTONE's person upon his initial arrest. MANTONE declined officer's requests for his consent search of the device and for his password / access code for the device.

11. On June 25, 2020, at approximately 1:28 am, SBPD officers obtained a search warrant for room #328 at the Green Mountain Suites from Vermont Superior Court Judge John L. Pacht. Officers and HSI Special Agents executed the search warrant at approximately 1:44 am. They located and seized approximately 5.21 pounds of apparent marijuana (based on its odor, appearance, and packaging), approximately 289.45 grams of suspected psilocybin mushrooms, approximately 2.06 grams of suspected MDMA powder, 6 pills of suspected clonazepam, and what appeared to be a written ledger. According to the hotel staff and hotel records, MANTONE had paid, in cash, for a month's stay in advance on May 31, 2020. No one else was listed as an occupant for the room, and no one was located in the room at the time of the search. Based on my training and experience, the combination of the seized marijuana, mushrooms and currency were consistent with distribution rather than mere personal use, and I know distributors of controlled substances frequently use written ledgers and/or digital notes to track their distributions of controlled substances and their collections of proceeds from those distributions.

12. Based on my knowledge and experience, including my direct participation in investigations into the distribution of controlled substances such as marijuana, I know that:

5

a. Persons who participate in the distribution of controlled substances frequently use cellular phones and other electronic devices to coordinate their unlawful activities and to maintain contact with their suppliers and customers.

b. Information stored in the memories of these communications devices can often constitute evidence of drug trafficking and/or the illegal movement of currency that represents the proceeds of drug trafficking. Among other things, the Electronic Device may contain the telephone numbers assigned to the Electronic Device itself, messages received by or sent from the Electronic Device regarding distributions or cryptocurrency transactions, contact numbers and identifying data for others involved in those activities, and records of telephone numbers to which calls were placed and from which calls were received.

c. Drug traffickers often take photographs of themselves with their products or proceeds, of other members of their organizations, of assets obtained from profits of drug sales, and of locations associated with their illegal activity. The photographs may also include embedded date and location data that could constitute or lead to evidence of the traffickers' activities.

d. I also know that persons engaged in such illegal activity will often deny ownership of devices—even devices found in their possession—in an attempt to thwart law enforcement's efforts to connect them to more serious crimes, possible co-conspirators, and/or their sources of supply. The Electronic Device is likely to contain evidence of its ownership and its primary users.

e. Data contained in a cell phone may reveal the physical location of the cell phone at various times. For example, the latitude and longitude of the camera at the time

it takes a photograph may be contained in the metadata associated with the picture. Also, if a cellular phone uses Global Positioning System ("GPS") capabilities for mapping programs, additional information regarding the historic locations of the phone may be recovered from the device.

    f. Controlled substance traffickers often maintain and access notes and records on their devices showing receipts, distributions, and collections similar to written ledgers. They also may store records and receipts of travel, such as airline tickets, and financial transactions such as money orders and wire transmissions. Those data are commonly stored on devices such as the Electronic Device.

    g. Persons involved in large-scale drug trafficking and the handling of proceeds from it frequently keep and access electronic records of the storage, purchase, and/or trading in large amounts of currency (including cryptocurrencies such as Bitcoin), financial instruments (including stocks, bonds, certificates of deposit, etc.), precious metals, jewelry, automobile titles, and other items of value. They may also track transactions and statements involving bank accounts. These items are often stored inside their electronic devices long after the acquisition and distribution of a particular load of controlled substances.

    h. When drug traffickers amass proceeds from the sale of drugs, the drug traffickers frequently attempt to legitimize or "launder" the proceeds. To accomplish these goals, drug traffickers many times use domestic and foreign banks and/or financial institutions with their attendant services, including sales of securities, cashier checks, money drafts, money orders, letters of credit, etc. Other entities used to "launder" monies include brokerage houses, real estate firms, shell corporations, and purported legitimate

7

business fronts. Electronically stored evidence of their attempts to legitimize or "launder" the proceeds is commonly secreted within the electronic storage of their electronic devices for long periods, even after they cease trafficking drugs.

13. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (also mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such

navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

14. Based on my training and experience, I know the Electronic Device to be searched in this case includes the features outlined above. Further, I know that electronic devices can store the data described for long periods, even if the user has attempted to delete some of the data. Similarly, things that have been viewed via the Internet are typically stored for lengthy periods on the device. These data can sometimes be recovered with forensics tools. The Electronic Device has been stored in a location and in a method such that its data remain intact at this time.

15. As further described in Attachment B, this application seeks permission to locate not only digital files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the Electronic Device was used, the purpose of its use, who used it, and when it was used. There is probable cause to believe this forensic electronic evidence will be on the Electronic Device for the following reasons:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

10

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

16. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## Conclusion

17. Based on the foregoing, I submit probable cause exists to search the Electronic Device specifically described in Attachment A for the evidence delineated in Attachment B.

Dated at Burlington, in the District of Vermont, this 13 day of July 2020.

Derik Curtis, Task Force Officer
Homeland Security Investigations
Department of Homeland Security


Subscribed and sworn to before me on July 13, 2020.

Hon. John M. Conroy, U.S. Magistrate Judge
United States District Court
District of Vermont